Bethany Stevens (SBN 245672)
bstevens@wscylaw.com
David Yang (SBN 246132)
dyang@wscylaw.com
WALKER STEVENS CANNOM YANG LLP
500 Molino Street #118
Los Angeles, CA 90013
Telephone: (213) 712-9145
Facsimile: (213) 403-4906

*Attorneys for Plaintiff,*
*Blackbird Tech LLC d/b/a Blackbird Technologies*

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLACKBIRD TECH LLC d/b/a BLACKBIRD TECHNOLOGIES,<br><br>Plaintiff,<br><br>v.<br><br>SCALEMATRIX, AND SCALEMATRIX HOLDINGS, INC.,<br><br>Defendants. | CASE NO. **'17CV1342 LAB WVG**<br><br>**COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**JURY TRIAL DEMANDED** |

| | |
|---|---|
| 1 | Plaintiff Blackbird Tech LLC d/b/a Blackbird Technologies ("Blackbird |
| 2 | Technologies") hereby alleges for its Complaint for Patent Infringement against |
| 3 | ScaleMatrix and ScaleMatrix Holdings, Inc. (collectively, "Defendant") on personal |
| 4 | knowledge as to its own activities and on information and belief as to all other |
| 5 | matters, as follows: |

## NATURE OF THE ACTION

1. This action arises under 35 U.S.C. § 271 for Defendants' infringement of Blackbird Technologies' U.S. Patent No. 8,424,885.

## THE PARTIES

2. Plaintiff Blackbird Technologies is a Delaware limited liability company with its principal place of business located at 200 Baker Avenue, Suite 203, Concord, Massachusetts 01742.

3. Defendant ScaleMatrix is a California corporation with a principal place of business at 5775 Kearny Villa Road, San Diego, California 92123. ScaleMatrix may be served via its registered agent, Emily A. Stebing, 5795 Kearny Villa Road, San Diego, California 92123.

4. Defendant ScaleMatrix Holdings, Inc. is a California corporation with a principal place of business at 5775 Kearny Villa Road, San Diego, California 92123. ScaleMatrix Holdings, Inc. may be served via its registered agent, Emily A. Stebing, 5795 Kearny Villa Road, San Diego, California 92123.

## JURISDICTION AND VENUE

5. This is an action for patent infringement arising under the provisions of the Patent Laws of the United States of America, Title 35, United States Code §§ 100, *et seq*.

6. Subject-matter jurisdiction over Blackbird Technologies' claims is conferred upon this Court by 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1338(a) (patent jurisdiction).

1   7.   This Court has personal jurisdiction over Defendant because Defendant is subject to general and specific jurisdiction. Defendant has also established minimum contacts with this forum. Defendant has been incorporated in California at all relevant times. Defendant regularly conducts business in this District, including by marketing, selling, and/or offering for sale the Accused Products (defined *infra*), and providing a variety of services including cloud hosting services. The exercise of personal jurisdiction comports with Defendant's right to due process because Defendant has purposefully availed itself of the privilege of conducting activities within the Southern District of California such that it should reasonably anticipate being haled into court here. As alleged herein, acts by Defendant in this district have caused injury to Blackbird Technologies.

8.   Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c) and § 1400(b) at least because Defendant is a California corporation with its principal place of business within this district, transacts business within this district, and has committed acts in this district that infringe U.S. Patent No. 8,424,885.

## U.S. PATENT NO. 8,424,885

9.   U.S. Patent No. 8,424,885 (the "'885 patent" or "patent-in-suit") entitled, "Method and Apparatus for an Environmentally-Protected Electronic Equipment Enclosure," was duly and legally issued by the U.S. Patent and Trademark Office on April 23, 2013. Blackbird Technologies is the owner by assignment of all right, title, and interest in and to the '885 patent, including all right to recover for any and all infringement thereof. The '885 patent is valid and enforceable. A true and correct copy of the '885 patent is attached as Exhibit A.

10.   Claim 1 of the '885 patent recites, for example, an electronic component enclosure. The electronic component enclosure comprises a platform, an inner frame coupled to the platform, and an enclosure surrounding the inner frame. Electronic components are mounted within the inner frame, and an environmental control unit generates cooled airflow that is directed to the electronic components through a

plenum. The cooled airflow is generated by the environmental control unit without introducing external air into the enclosure.

11. Claim 5 of the '885 patent recites, for example, an electronic component enclosure. The electronic component enclosure comprises a platform, an inner frame coupled to the platform, and a water-resistant enclosure surrounding the inner frame. Electronic components are mounted within the inner frame, and an environmental control unit generates cooled airflow without introducing external air into the enclosure.

12. Dependent claims 2 and 10 of the '885 patent further recite, for example, that the platforms of claims 1 and 5 are adapted to accept forks of a jacking device.

## COUNT I – INFRINGEMENT OF U.S. PATENT NO. 8,424,885

13. Blackbird Technologies reasserts and incorporates by reference Paragraphs 1 through 12 of this Complaint as if fully set forth herein.

14. Defendant makes, uses, sells, offers to sell, and/or imports into the United States cabinets for cooling electronic components that implement what Defendant calls "Dynamic Density Control" (the "Accused Products"). (*See, e.g.*, Ex. C (printout of https://scalematrix.com/ddc/).) These Accused Products include without limitation the S-1017, S-1034, and S-1052 models, and all prior versions or variations that implement "Dynamic Density Control" such as the SM2000. (*See* Exs. C at 13-15; L.)

15. The Accused Products include a platform. For example:



(Ex. C at 18-20.)

16. The Accused Products have an inner frame coupled to the platform, which is designed to have electronic components mounted therein. For example:



(Ex. B (ScaleMatrix Data Center World 2017 presentation materials) at 27, *available at* http://global.datacenterworld.com/dcwg17/Custom/Handout/Speaker0_Session10182 08_1.pdf.)

17. The Accused Products have an enclosure surrounding the inner frame. For example:



(Ex. B at 6.)

18. The enclosure surrounding the inner frame is water-resistant. (*See, e.g.*, Ex. C at 8-9 ("The DDC enclosure design provides the ultimate in environmental control. The NEMA3 rated, air-filtered cabinets protect your IT equipment from particulate, moisture, and tampering, while enabling the platform to be installed in areas considered less than hospitable for traditional data center equipment."); Ex. D at 5 ("The cabinets are NEMA 3 rated, making them airtight and watertight. They also sit on four one-inch legs, to keep the cabinets off the datacenter floor in case of a water leak in the facility, and for extra protection as part of a facility's seismic reinforcement. Because they are fully enclosed, and the inside temperature is managed within a two-degree variation, ScaleMatrix says its cabinets are virtually dust-free (which can extend the life of the IT gear housed within)."), *available at* https://www.scalematrix.com/cloud-star-scalematrix-plans-modular-data-center-product-launch.)

19. The Accused Products have an environmental control unit that generates cooled airflow without introducing external air into the enclosure. *See, e.g.*, Ex. C at 8 ("The in-cabinet liquid-air cooling system enables the platform to deliver precise temperature control to the intake side of the cabinet, which is maintained to within a few degrees of the set-point automatically."); Ex. C at 14 (identifying the HVAC System in each of the S-1017, S-1032, and S-1052 models) Ex. E at 2 ("The cabinet is sealed, with air filters, humidity control and fire suppression handled within the enclosure. Air is recirculated within the cabinet, with cool air delivered to server inlets via an 8-inch air plenum in the front of the rack. When exhaust heat exits the back of the equipment, it rises to the cooling compartment and is cooled and recirculated."), *available at* https://www.scalematrix.com/press/scalematrix-cabinet-design-drives-extreme-density; Ex. E at 3 ("Cooling is provided by a fin-and-tube heat exchanger, which is fed by a cool water loop that runs overhead and attaches to the top of the cabinet. The use of containment allows ScaleMatrix to maintain temperatures within a 2 degree temperature range throughout the rack. The temperature within the rack is closely monitored and managed by an in-house DCIM (data center infrastructure management) system, which can regulate the temperature by adjusting a variable control valve on the cooling loop.").

20. The Accused Products' generated cooled airflow is directed to the electronic components through a plenum. (*See, e.g.*, Ex. E at 2 ("The cabinet is sealed, with air filters, humidity control and fire suppression handled within the enclosure. Air is recirculated within the cabinet, with cool air delivered to server inlets via an 8-inch air plenum in the front of the rack. When exhaust heat exits the back of the equipment, it rises to the cooling compartment and is cooled and recirculated.").)

21. Therefore, the Accused Products meet all of the limitations of at least claims 1 and 5 literally and/or under the doctrine of equivalents.

22. At least the SM2000 also meets the additional limitations of dependent claims 2 and 10 literally and/or under the doctrine of equivalents because, as shown *infra* at paragraph 39, the SM2000 has a platform that is adapted to accept forks of a jacking device like the EMS R.A.S.E.R.

### *Direct Infringement of Claims 1, 2, 5, and 10*

23. Defendant, pursuant to 35 U.S.C. § 271(a), has directly infringed and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the '885 patent, including at least claims 1, 2, 5, and 10 by making, using, selling, and offering to sell, in this judicial district and/or elsewhere in the United States, and/or importing into the United States, Accused Products with electronic components installed therein, including without limitation datacenters with the Accused Products. For example, Defendant operates at least two datacenters with the Accused Products in San Diego, California and Houston, Texas. (*See, e.g.*, Exs. F, *available at* https://www.scalematrix.com/location/san-diego-data-center; & G, *available at* https://www.scalematrix.com/location/houston-data-center.)

### *Inducement of Claims 1, 2, 5, and 10*

24. Since before the filing of this Complaint (*see infra* ¶¶ 25–45 (alleging pre-suit knowledge of the '885 patent)), Defendant, pursuant to 35 U.S.C. § 271(b), knowingly and intentionally actively induces the infringement of one or more claims of the '885 patent, including at least claims 1, 2, 5, and 10 by instructing and otherwise encouraging infringement by intending and instructing customers of the Accused Products to install electronic components therein. (*See, e.g.*, Ex. M (Brad Graves, *ScaleMatrix Offers To Put Its Highly Efficient Data Center Technology On-Site*, SAN DIEGO BUSINESS JOURNAL, May 16, 2016) at 1 ("Today, subsidiary ScaleMatrix Cabinet Technology lets clients use the patent-pending cabinets …. Antivirus software maker ESET has its own installation of ScaleMatrix cabinets in its downtown San Diego office. Not far away, on San Diego's waterfront, the USS Midway Museum put some green server cabinets in the hull of the retired aircraft

carrier."), *available at*

https://www.scalematrix.com/sites/default/files/pdf/ACoolInnovationSan_Diego_Business_Journal_Scalematrix.pdf.)

### *Willful Infringement of Claims 1, 2, 5, and 10*

25. Elliptical Mobile Solutions, LLC ("EMS") is the original assignee of the '885 patent.

26. In 2010, EMS was an exhibitor at a trade show called Interop 2010 in Las Vegas, Nevada.

27. At the Interop 2010 trade show, EMS showcased its "Micro-Modular Data Centers," including the R.A.S.E.R. enclosure. (*Cf.* Ex. H (EMS brochure providing overview of EMS "Micro-Modular Data Centers," including the R.A.S.E.R. enclosure).) EMS was selected as a finalist for the "Best of Interop" award in the infrastructure category. (*See, e.g.*, RASER Interop Award Video, *available at* https://youtu.be/fiOsFS9Snpg?t=2m40s.)

28. Mark Ortenzi, Defendant's CEO and co-founder, was formerly president of CariNet.

29. While president of CariNet, Mark Ortenzi attended the Interop 2010 trade show.

30. Mark Ortenzi met EMS at the Interop 2010 trade show and expressed interest in their R.A.S.E.R. enclosure.

31. EMS handed out brochures to potential customers, which would have included Mark Ortenzi, at the Interop 2010 trade show. On information and belief those brochures were the same or materially the same as the brochure attached as Exhibit H.

32. The brochure attached as Exhibit H provides notice of the EMS patent portfolio. (*See, e.g.*, Ex. H at 2 ("Elliptical Mobile Solutions' (EMS) patented closed loop cooling confines the hot and cold aisle within the rack so that cooling is applied directly to the equipment."), 3 ("Our patented adaptive suspension uses In Motion

Engineering™ to eliminate the harmful effects of motion, shock, and vibration."), 7 ("Founded in 2005, Elliptical Mobile Solutions has invested more than four years developing, testing, and patenting its equipment.").)

33. After the Interop 2010 trade show, the EMS presentation attached as Exhibit I was given to CariNet via web conference, which Mark Ortenzi attended.

34. The EMS presentation to CariNet included discussions on the EMS R.A.S.E.R. enclosure and its "hot and cold aisle containment" for closed-loop cooling:



(Ex. I at 4; *see also* Ex. H at 2 ("Elliptical Mobile Solutions' (EMS) patented, **onboard closed loop cooling** confines the hot and cold aisles within the enclosure so that cooling is applied directly to the equipment.") (emphasis in original).)

35. The EMS presentation to CariNet also included discussions on EMS datacenter "Micro Modular" design:



(Ex. I at 15.)

36. Mark Ortenzi left CariNet with other CariNet employees who participated in the EMS presentation and formed ScaleMatrix. (*Cf.* Ex. J (Articles of Incorporation of ScaleMatrix, filed on July 13, 2010.)

37. According to the EMS investor presentation attached as Exhibit K, ScaleMatrix ordered multiple EMS R.A.S.E.R. enclosures:

**2010 SALES PIPELINE DEALS**

| Partner: End User | PRODUCT | Q3 REV | Q4 REV |
|---|---|---|---|
| GTS: Scalematrix "Price Quote Sent" | RASERS 10,25 | $550,000 | $1,375,000 |

(adapted from Ex. K at 17.)

| 2011 SALES PIPELINE DEALS | | | | | |
|---|---|---|---|---|---|
| Partner: End User | PRODUCT | Q1 REV | Q2 REV | Q3 REV | Q4 REV |
| GTS: Scalematrix "Cust. Plan for 100 unit per qrter" | RASERS | $5,000,000 | $5,000,000 | $5,000,000 | $5,000,000 |

(adapted from Ex. K at 18.)

38. In view of the ScaleMatrix R.A.S.E.R. orders, EMS designed and presented to ScaleMatrix a 3D mockup proposal for a "Micro-Modular Data Center" featuring the R.A.S.E.R. enclosure. For example:



(screenshot from 3D mockup proposal created by EMS for ScaleMatrix.)

39. Instead of agreeing to buy EMS "Micro-Modular Data Centers," ScaleMatrix, under Mark Ortenzi's leadership, built the Accused Products, which have materially identical features as compared to the EMS R.A.S.E.R. product. ScaleMatrix marketed the Accused Products using the same or similar language used in EMS R.A.S.E.R. presentations, such as "Micro Modular Design," "Closed Loop Cooled," and "Hot & Cold Aisle Containment." For example:

| EMS R.A.S.E.R. | ScaleMatrix SM2000 |
|---|---|
|  |  |
| | (Ex. L (highlighting added).) |

40. Defendant is allegedly trying to patent features of the Accused Products. (*See, e.g.*, Ex. D at 2 ("ScaleMatrix has two datacenters, and both are fitted out using its patent-pending cabinets.").)

41. Because Defendant is allegedly prosecuting patent applications relating to the Accused Products, Defendant owes the U.S. Patent & Trademark Office ("USPTO") "a duty of candor and good faith in dealing with the Office, which

includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section." MPEP § 2001.

42. The duty of candor applies to, *inter alios*, "each inventor named in the application" and "every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application." MPEP § 2001.

43. Upon information and belief, at least Mark Ortenzi owed a duty of candor to the USPTO for Defendant's prosecution of patent applications relating to the Accused Products.

44. Mark Ortenzi, as part of his duty of candor to the USPTO, has been on notice that the EMS patent portfolio exists and that it is likely relevant and material to the prosecution of Defendant's patent applications relating to the Accused Products. Therefore, Mark Ortenzi has been obligated to investigate and disclose the EMS patent portfolio to the USPTO, including the '885 patent.

45. Therefore, Defendant, at least through Mark Ortenzi, has prior knowledge of the patent-in-suit.

46. In view of Defendant's prior knowledge of the '885 patent, prior knowledge of the EMS R.A.S.E.R. enclosure that the '885 patent covers, and the overt similarities between the Accused Products and the EMS R.A.S.E.R. product that infer deliberate copying of the EMS R.A.S.E.R. product by Defendant, Defendant's infringement has been and continues to be egregious at least because of the reckless disregard of the objectively high likelihood of its prior and ongoing infringement of the '885 patent.

47. Under these facts, Defendant's infringement has been and continues to be egregious and willful.

## DAMAGES

48. On information and belief, 35 U.S.C. § 287(a) was complied with at all relevant times.

49. Blackbird Technologies has sustained damages as a direct and proximate result of Defendant's infringement of the '885 patent.

50. As a consequence of Defendant's past infringement of the '885 patent, Blackbird Technologies is entitled to the recovery of past damages in the form of, at a minimum, a reasonable royalty.

51. As a consequence of Defendant's continued and future infringement of the '885 patent, Blackbird Technologies is entitled to royalties for its infringement of the '885 patent on a going-forward basis.

52. Because Defendant's infringement of the '885 patent has been and continues to be willful, Blackbird Technologies is entitled to treble damages.

## PRAYER FOR RELIEF

WHEREFORE, Blackbird Technologies respectfully requests that this Court enter judgment against Defendant, as follows:

A. Adjudging that Defendant has infringed at least claims 1, 2, 5, and 10 of the '885 patent literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. §§ 271(a) and (b);

B. An award of damages to be paid by Defendant adequate to compensate Blackbird Technologies for Defendant's past infringement and any continuing or future infringement up until the date such judgment is entered, and in no event less than a reasonable royalty, including interest, costs, and disbursements pursuant to 35 U.S.C. § 284 and, if necessary to adequately compensate Plaintiff for Defendant's infringement, an accounting of all infringing sales including without limitation those sales not presented at trial;

C. Ordering Defendant to continue to pay royalties to Blackbird Technologies for infringement of the '885 patent on a going-forward basis;

D. Awarding Blackbird Technologies treble damages based on any infringement found to be willful pursuant to 35 U.S.C. § 284;

E. Adjudging that this case be exceptional under 35 U.S.C. § 285 and awarding enhanced damages, including costs and attorneys' fees, to Blackbird Technologies;

F. Awarding Blackbird Technologies pre-judgment and post-judgment interest at the maximum rate permitted by law on its damages; and

G. Granting Blackbird Technologies such further relief as this Court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Blackbird Technologies demands a trial by jury on all claims and issues so triable.

DATED: June 30, 2017

OF COUNSEL

Christopher Freeman
cfreeman@blackbird-tech.com
Wendy Verlander
wverlander@blackbird-tech.com
John Handy
jhandy@blackbird-tech.com
Blackbird Tech LLC d/b/a
Blackbird Technologies
One Boston Place, Suite 2600
Boston, MA 02108
(617) 307-7100

WALKER STEVENS CANNOM YANG LLP

*/s/ Bethany Stevens*
Bethany Stevens (SBN 245672)
bstevens@wscylaw.com
David Yang (SBN 246132)
dyang@wscylaw.com
500 Molino Street #118
Los Angeles, CA 90013
Telephone: (213) 712-9145
Facsimile: (213) 403-4906

*Attorneys for Plaintiff
Blackbird Tech LLC d/b/a
Blackbird Technologies*